## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

(1)  JOHN HAYDEN BLANKENSHIP and
HAYLEE BLANKENSHIP as Co-Personal
Representatives of the Estate of
ANDREA LYNN BLANKENSHIP, deceased
(DC Grady Co. PB-2021-43);

(2)  DELSIE MAE PYE, both individually and as
Personal Representative of the estate of
LEON W. PYE; (DC Grady Co. PB-2022-19)

(3)  TASHA COLLEEN YATES and
TARANZO LENARD PYE as next friends of,
with DELSIE MAE PYE as Personal
Representative of the estate of
K.W.R.P.(a/k/a Yates)
(DC Okla. Co. PB-2022-171);

*Plaintiffs,*

-vs-

(1)  JOHN KEVIN STITT, in his official Capacity
as the 28ᵗʰ Governor of Oklahoma;

(2)  STATE OF OKLAHOMA ex rel.
OKLAHOMA PARDON AND
PAROLE BOARD;

(3)  JOHN or JANE DOE, both individually and as
employee of the Pardon and Parole Board;

(4-8)  (4) TOM BATES, (5) EDWARD KONIECZNY,
(6) SCOTT WILLIAMS,
(7) RICHARD SMOTHERMON,
(8) CATHY STOCKER, all as current members
of Pardon and Parole Board;

(9-13)  (9) ADAM LUCK, (10) KELLY DOYLE,
(11) C. ALLEN McCALL, (12) LARRY MORRIS,
& (13) ROBERT GILLILAND individually and as
former Board Members of Pardon & Parole Bd.;

(14)  STATE OF OKLAHOMA ex rel.
OKLAHOMA DEPT. OF CORRECTIONS;

(15)  SCOTT CROW, as Director of
Okla. Dept. of Corrections;

(16)  ROSS FISHER, M.D., as Chief Medical
Officer of the Okla. Dept. of Corrections;

(17)  JANNA MORGAN, PH.D., as Chief Mental
Health Officer Oklahoma Dept. of Corrections;

(18)  THE OKLAHOMA MENTAL HEALTH
COUNCIL, INC. d/b/a RED ROCK BEHAVIORAL
HEALTH SERVICES, a not-for-profit established
under Oklahoma law;

(19)  VIVIAN HASBROOK as Medical Director
of Red Rock Behavioral Health Services; and

(20)  LAWRENCE PAUL ANDERSON,
individually;

*Defendants.*

Case No.: CIV-22-958-PRW

# AMENDED COMPLAINT

## JURISDICTION AND VENUE

1.      Plaintiffs Hayden and Haylee Blankenship as Co-Personal Representatives of the Estate of Andrea L. Blankenship (PB-2021-43 D.C. Grady County) were at all times pertinent to this action residents of Oklahoma County, State of Oklahoma.

2.      Plaintiff Delsie Mae Pye individually and as Personal Representative of the Estate of Leon W. Pye (PB-2022-19 D.C. Grady County) is at all times pertinent to this action a resident of Grady County, State of Oklahoma.

3.      Plaintiffs Tasha Colleen Yates and Taranzo Lenard Pye as next friends of their daughter along with Delsie Mae Pye as Personal Representative of the Estate of K.W.R.P. a/k/a Yates (PB-2022-171 D.C. Oklahoma County) at times pertinent to this action have been residents of both Oklahoma and Grady Counties, State of Oklahoma.

4.      Defendant Governor Stitt ("Governor") is and was at all times pertinent to this action the Chief Executive of the State of Oklahoma who had the ultimate authority and decision-making authority to grant commutation to convicted inmates who meet certain criteria. The Governor is sued for both federal and state law claims.

5.      Defendant Oklahoma Pardon and Parole Board ('the Board") is and was at all times pertinent to this action an agency or board acting on behalf of the State of Oklahoma, a political subdivision of the State of Oklahoma. The Board is sued for both federal and state law claims. At all times pertinent to this action, the members and employees of the Board were acting under the color of law and, based on information and belief, acted outside the course and scope of their employment with the Board as it relates to their conduct that violated the standards listed herein, and to the extent they helped create

a standard, practice, procedure, custom and pattern of conduct that violated the constitutional rights of Plaintiffs and both federal and state law.  The Board is the final policymaker for the State of Oklahoma as it relates to the issuance of pardons and paroles. There is no other person or agency who has authority over the Board. Because of their position, the acts, customs, policies, practices, failure to train and failure to supervise the employees alleged herein are attributable to the State as well as to the Board in its official capacity.

6.     Defendant John/Jane Doe is a member of the administrative staff who was not identified, but according to the Final Report of the Oklahoma County Grand Jury, GJ-2021-1, (page 43):

> "became aware of the Anderson case being docketed in error.  The discovery was made at a time when it could have been easily corrected.  However, a unilateral decision was made by one person not to bring the error to the attention of the Board or the Governor's office.  This failure to immediately bring the error to the Board's attention prevented the Board from correcting the error before the case went to the Governor for approval.  Failure to notify the Governor immediately of this error also prevented the Governor's office from denying the recommendation to commute Anderson's sentence."

7.     Defendant Doe was not acting within the scope of his/her employment but was acting under color of law, and while doing so totally disregarded his/her duty to the citizens and Constitution of the State of Oklahoma.

8.     Other findings of the Grand Jury explain the likely motivation for Defendant "Doe" to fail to report Anderson's ineligibility, and that is an overriding inappropriate pressure Governor Stitt was placing on the Pardon and Parole Board to release as many people as possible as quickly as possible.

9.      Defendant Oklahoma State Department of Corrections ("DOC") is and was at all times pertinent to this action a state agency acting on behalf of the State of Oklahoma, a political subdivision of the State of Oklahoma. DOC is sued for both Federal and State law claims.  At all times pertinent to this action, the members and employees of DOC were acting under the color of law and, based on information and belief, acted outside the course and scope of their employment with DOC as it relates to their conduct that violated the standards listed herein, and to the extent they helped create a standard, practice, procedure, custom and pattern of conduct that violated the constitutional rights of Plaintiffs and both federal and state law.

10.     DOC is the final policymaker for the State of Oklahoma as it relates to the care and supervision of inmates, detainees and those incarcerated by the State of Oklahoma. There is no other person or agency who has authority over DOC. Because of their position, the acts, customs, policies, practices, failure to train and failure to supervise the employees alleged herein are attributable to the State as well as to DOC in its official capacity.

11.     Defendant The Oklahoma Mental Health Council, Inc. dba Red Rock Behavioral Health Services (Red Rock) is and was at all times pertinent to this action an entity organized under the laws of the State of Oklahoma as a mental health facility hired by Defendant DOC and other State contracts charged with assessing, treating and monitoring Defendant Anderson for documented mental health issues both before and after his release from incarceration.

12.     Defendant Anderson is and was at all times pertinent to this action a resident of Grady County, State of Oklahoma.

13.     The acts complained of in this action all occurred within the confines of the Western District of Oklahoma.

## ADMINISTRATIVE PREREQUISITE TO SUIT

14.     Plaintiffs have complied with the administrative requirements of the Oklahoma Governmental Tort Claims Act, found in Title 51, O.S §156 by serving a Notice of Claim on the 8th day of February 2022 to the Office of Management and Enterprise Services.

15.     The State did not attempt to settle or even deny said claims within ninety (90) days, therefore, said claims were deemed denied by operation of law, giving rise to a 180-day period within which this matter must be filed.

16.     Plaintiffs, by this reference, incorporate all claims set out in the Notice of Tort Claim.  A true and correct copy of Plaintiffs' Notice of Claim is attached hereto as "Exhibit-1".

## FEDERAL JURISDICTION

17.     This action is brought pursuant to 42 U.S.C. Section 1983 and the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as the laws of the State of Oklahoma.

18.     This Court has federal question jurisdiction of this action pursuant to 28 U.S.C. 1331; venue is proper pursuant to 28 U.S.C. 1391.

19.     The matter in controversy exceeds $75,000, exclusive of costs and interest.

20.     Plaintiff also asserts causes of action arising under Oklahoma law, namely claims for negligence. This Court has supplemental jurisdiction over these claims pursuant to  28 U.S.C. 1367.

21.    Jurisdiction and venue are proper herein pursuant to 42 U.S.C. 1983.

22.    The conduct of the Defendants was within the exercise of State authority within the meaning of 42 U.S.C. 1983.

## FACTUAL BACKGROUND

23.    In 2019, the State of Oklahoma, according to statements made by Defendant Governor Stitt, had the highest incarceration rate of all states.

24.    The high incarceration rates of the State of Oklahoma may include a high number of people who are held pending trial and unable to post bond, and others who were convicted of low-level possession of marijuana but given long sentences and would no longer be incarcerated due to changes in statutes regarding punishments for certain crimes, had they been convicted in 2019 or thereafter.

25.    The Governor publicly stated his goal for the State to reduce and commute prison sentences of those incarcerated to reduce the State's incarceration rates and to save the State between 12-16 million dollars annually by not having so many people incarcerated.

26.    To carry out the Governor's goal, it was well publicized he planned to push as many prisoners through the pardon, parole and commutation process so as to release as many as possible, as quickly as possible.

27.    At all times pertinent to this action, the State's policies and procedures regarding consideration of those who applied for commutations included both objective and nondiscretionary protocols.  If someone applied for, but was denied commutation, that individual may not be considered, or even apply again, for a period of three years from the denial of his/her application for commutation.

28.     One purpose of this policy and procedure related to the three-year ban on reapplying for commutation, is and was, in part, to protect the public from violent offenders who were incarcerated and found to pose a threat to themselves or others. The three-year waiting period serves as a time in which the inmate could be treated and/or work on problems or conditions to get better and demonstrate they have the potential to be successful once released, so that they can function without violating the law and they no longer present a danger to themselves or others.

29.     The justification Defendants gave, both directly and through agents, was mass-commutations were only for non-violent offenders, most of whom were convicted of crimes whose penalties had been reduced from felonies to misdemeanors through a state question passed by voters and codified by the legislature.  In reality and stark contrast, Defendant Anderson had a long and at times violent criminal past, including but not limited to:

    a.    Felony convictions in Arkansas in 1998 and 2002 for illegal drug manufacturing, delivery and possession, and robbery (48 CR-98-22 and 74 CR-02-18)

    b.    Felony conviction in Grady County in CF-2005-469 for distribution of a controlled dangerous substance;

    c.    Felony convictions in Oklahoma County in CF-2006-3808 of four counts, including (1) & (2) (FELONY) Pointing a Firearm at another (21 OS. 1279, 1289.6); (3) (FELONY) Possession of CDS / Schedule II / Cocaine with intent to distribute in violation of 63 O.S. 2-401 and 2-420; and (4) (Misdemeanor) Assault and Battery—Domestic Abuse in violation of 21 O.S. 644 (C), arising out of attacking his girlfriend and pointing a gun at her;

    d.    Felony conviction in Grady County in CF-2010-115 of four counts of possession of CDS and was sentenced to 35 years, to serve 15 years with 20 years to be suspended;

    e.    Felony conviction in Grady County 2012 for selling crack cocaine near an

elementary school;

f.      Pleaded guilty on the 18th of December 2017 in Grady County Case No. CF-2017-318 for (1) Felony of Possession of Firearms after Conviction of a Felony (21 O.S. 1283, (2) Felony of Bringing Contraband (Weapons/Explosives/Drugs, etc., in a Jail/Penal Institution (57 O.S. 21(A), and (3) (Misdemeanor Possession of Controlled Dangerous Substance (Methamphetamine/PCP) (violation of 63 O.S. 2-402); and

g.      On DOC's recommendation, Anderson's suspended sentence was revoked and on November 20, 2017, he was sentenced in CF-2017-318 to 20 years on the felony counts and one year on each of the misdemeanor counts.

30.     DOC knew at least as early as 2017 that Defendant Anderson posed a threat to both himself and other people in the community, but he still received reduced sentencing. After numerous violations of his parole on November 8, 2017, the Oklahoma Department of Correction Chickasha Probation and Parole Officers reported that "Probation is not a sufficient deterrent as Anderson remains a threat to both society and himself.  The Parole Officer recommended Anderson's probation "be revoked in full."

31.     Defendant Anderson first applied for commutation on January 17, 2019, for his 2010 and 2017 convictions.  While he made inaccurate statements in his application (which the PPB vetted and submitted for approval to the Board), he admitted being disciplined over the years for fighting with other inmates, possessing sharp objects and menacing a female staff member with sexual remarks.  A copy of his 1st application is attached hereto as "Exhibit-2".

32.     On July 18, 2019, the PPB denied the commutation request by a 3-2 vote. The only two Board Members voting in favor of the first application were Kelly Doyle and Adam Luck, both of whom were appointed by Governor Stitt.

33.     As noted above, Defendant Anderson was in fact a threat to both himself and the public, which was likely one of the reasons Defendant Anderson's January 2019

application for commutation was denied on July 18, 2019.

34.     Defendant Anderson promptly re-applied for commutation on August 8, 2019.  His application actually acknowledged that he previously applied in January 2019.  A copy of his August 8, 2019 application is attached hereto as "Exhibit-3".

35.     Pursuant to the Pardon and Parole Board rules, Anderson was not eligible to be considered again for commutation for three more years.  (Oklahoma Administrative Code 515:15-15-1.)

36.     According to the Oklahoma Supreme Court, Oklahoma Administrative Code has the full force and effect of positive statutory law.

37.     Incredibly, on the 9th of October 2019, all five (5) members of the Pardon and Parole Board voted unanimously to advance the application to January 2020, while an Investigative Report would be considered.

38.     On December 12, 2019 the Pardon and Parole Board issued an investigative determination Report.  Instead of determining Anderson was ineligible for commutation for three (3) years, the "report" completely failed to acknowledge Anderson's first Commutation Application and the fact that it had been denied on July 18, 2019.  In fact, the Investigative Report indicated Anderson had made NO previous applications.  A copy of the "report" is attached hereto as "Exhibit-4".

39.     The Pardon and Parole Board's power is outlined and limited by statute.  Title 57 Okla. Stat. §332 includes several provisions that the Pardon and Parole Board must follow, specifically requirements that notice of each Application for Commutation being filed so the State and through them "victims of crime" are on notice and given an opportunity to be heard.

40.     Defendant Board acted with complete indifference and disregard to both State law and its own rules violating mandates of Title 57 Okla.Stat. §332, when it accepted, considered and approved Anderson's second commutation application and when it:

(B)…failed to provide a copy of the application to the District Attorney, the Victim or representative of the victim and the Office of the Attorney General within ten (10) business days of the receipt of such application, and

(C)   failed to send a copy of the application for commutation…to trial officials (including: 1. The current elected judge of the court where the conviction was had; 2. The current elected district attorney of the jurisdiction where the conviction was had; or 3. The chief or head administrative officer of the arresting law enforcement agency.) (any of whom)…shall have twenty (20) business days to provide a written recommendation or protest prior to consideration of the application.

41.     The practice of not giving proper notice to various district Attorneys had been challenged by at least two different Attorneys General along with the President of the District Attorneys' Counsel.

42.     District attorneys represent the citizens who live in or conduct business in their districts.

43.     Failure to provide statutory notice to the District Attorneys denies the citizens of their rights under both the Federal and State constitutions.

44.     The conduct of the Board under the circumstances was intentional in nature, in that they knew:  (a) of Defendant Anderson's history and (b) the policies and procedures that banned him from applying for his commutation for three years, but (c) intentionally allowed his packet to be processed and presented to both the Board and Governor.  At a minimum, Defendants' conduct in this matter constituted gross negligence and/or recklessness.

45.     Based on the policies, procedures and law of the State of Oklahoma,

Anderson should not have been allowed to re-apply or otherwise be considered by the Pardon and Parole Board.

46. There is no evidence that Defendant Anderson was treated for his psychiatric issues, nor any evidence that his condition had improved since the 2017 probation revocation report which found him to be a risk to himself and to the general public.

47. Defendant DOC, knew in 2017 and in 2019, at the time it approved Defendant Anderson to be considered for commutation, that Defendant Anderson was a threat to both himself and the public.

48. The Pardon and Parole Board knew in 2019 that Defendant Anderson was a threat to both himself and the public.

49. The Pardon and Parole Board, DOC and the Governor had non-discretionary obligations—governed by established policies, protocols, and other rules—directing how they must assess the eligibility of a person to be considered for commutation.

50. The basis of this lawsuit against the State and these Defendants is their failure to abide by, follow and observe policies, procedures and protocols related to whether an inmate is eligible to apply for or may even be considered for commutation, and the State's abject failure to protect Plaintiffs' Constitutional rights to life, liberty and property.

51. DOC also had a non-delegable duty to coordinate with Defendant Red Rock Behavioral Health and other providers set out in its own policy, #OP-060901, titled "Pre-Release Planning and Reentry Process" a previous version dated October 8, 2020 was in effect when Defendant Anderson was given a Commutation.

52. The Pre-Release Planning and Reentry Process requires that a detailed plan be developed and followed beginning a year prior to the release of the inmate.

53. A case manager should have been assigned, it is well established law and policy

11

that establishing and following a Pre and Post Release plan is vital in effective transition and to make sure mental health services are provided.

54.    The lack of discharge planning and services by prisons for prisoners with mental illness has been taken to court.  In Wakefield v Thompson, a federal appeals court considered whether the Eighth Amendment claim was stated by Plaintiff's allegations that correctional staff at a California prison ignored the instructions of his doctor by refusing to provide him upon his release from prison with the prescribed two-week supply of the psychotropic medication that he took because he suffered from Organic Delusional Disorder.

55.    The court ruled that state:

"must provide an outgoing prisoner who is receiving and continues to require medication with a supply sufficient to ensure that he has that medication available during the period of time reasonably necessary to permit him to consult a doctor and obtain a new supply.  A state's failure to provide medication sufficient to cover this transitional period amounts to an abdication of its responsibility to provide medical care to those, who by reason of incarceration are unable to provide for their own medical needs."

56.    DOC acted with complete indifference and disregard to both State law and its own policies and rules by failing to do Pre-Release planning, by failing to maintain an infrastructure of inmate reentry including identification, case planning, training, programming and pre-planning, which is critical to inmate success post-discharge.

57.    Red Rock as a community partner and vendor for DOC had a duty to ensure a continuation of Anderson's psychiatric care until a hand-off to an outside provider was completed.

58.    There were indications of Anderson telling Defendant Probation and Parole Board and Defendant DOC that after release he planned to live in Texas and to obtain a job working in the oil patch with a family member's husband.  However for this to have been approved an interstate compact would have required that resources were in place and

available to Anderson.

59.     For any inmate with mental health issues to make a transition after release and not end up committing new crimes and going right back to prison, there must be collaboration between DOC and outside service providers like Defendant Red Rock, as well as agencies and service providers who will be involved in the release, supervision, support, and treatment of the releasee including at minimum, corrections, parole (or releasing authority), mental health, housing, employment, health, and welfare, and private providers of treatment and support services.

60.     There is no evidence these well-established standards were followed for Anderson or any of the other inmates (with or without mental health issues) released under Governor Stitt's dangerous plan to save money.

61.     The recidivism rate has been significant, other violent crime has occurred which may be a factor in explaining how Oklahoma can now have a higher violent crime rate per capita than New York or California.  An early report on Oklahoma recidivism is set out in Exhibit-5.

62.     In January 2020, Defendant Pardon and Parole Board recommended that Defendant Anderson's twenty plus year sentence be commuted to just nine (9) years for drug crimes and that other crimes be commuted; Defendant Governor approved the commutation on June 16, 2020, to be effective June 23, 2020.  Defendant Anderson was released on or about January 18, 2021.  A copy of the Certificate of Commutation is attached hereto as "Exhibit-6."

63.     Only three weeks after Defendant Anderson was released, on February 9, 2021, he brutally and savagely killed the three Plaintiff's decedents listed above: Andrea Lynn Blankenship (age 41), Leon W. Pye (age 68) and K.W.R.P. (age 4).  The Medical

Examiner's Report of Autopsy found that:

> Ms. Blankenship suffered multiple traumas including two (2) complex, gaping, sharp force wounds of the left face and central anterior torso along with 37 additional stab wounds (some irregular, favor multiple instruments); six (6) irregular wounds of the scalp with features of both sharp and blunt force trauma; and numerous other wounds. Injuries to her head included the traumatic removal of her left eye, extensive comminuted facial and jawbone fractures, numerous stab wounds, etc.

64.    As to her torso, the Medical Examiner found that:

> …she had suffered large, complex, sharp force wound of central chest and upper abdomen with separation of left anterior chest wall from sternum and eviscerated bowel extending from the wound, including the traumatic removal of most of her heart, near complete bowel evisceration, stomach evisceration and numerous other stab wounds, along with numerous defensive-type injuries of the bilateral distal upper extremities.

65.    The Medical Examiner went on to state that:

> …her entire left eye and majority of her heart appeared to have been cut out and were not found on the scene; her bowels and stomach were eviscerated and lying outside of her body with her stomach located separately from her bowels.

66.    If the State had complied with its mandatory obligations and the mandatory directives listed above had not been violated, Defendant Anderson would not have been considered for, much less given, a recommendation for commutation of his sentence, and Anderson could not have killed Andrea Lynn Blankenship, Leon W. Pye, K.W.R.P. and could not have mutilated and attempted to murder Delsie Mae Pye.

67.    Defendant Governor later referred the matter of Defendant Anderson's commutation to the Oklahoma State Bureau of Investigation to investigate whether there was any wrongdoing in the process of Defendant Anderson being considered for the commutations, advising the OSBI that "information has been presented to me…which raised concerns that violations of state law and/or violations of the rules of the Pardon and Parole Board may have been committed affecting the recommendations of the Board .."

related to Defendant Anderson.

68.     The State employees who were involved in the commutation process knew about Defendant Anderson's past, the fact that his parole officer was of the opinion he was violent and posed a threat to himself and others, and that his prior Application for Commutation had been denied, making him ineligible to be considered for commutation in 2020; accordingly, they were required to act reasonably in handling the information they received and to forward the information to both the Pardon and Parole Board and the Governor.

69.     The protocols governing eligibility for commutation regarding the three-year waiting period after being denied commutation squarely govern Defendant Anderson's eligibility; it is beyond debate that he was not eligible and that the State violated its own known protocols, policies and procedures related to Anderson's commutation process

70.     The State knew Defendant Anderson was a danger to both himself and others.

71.     As it relates to the Pardon and Parole Board, the Oklahoma Constitution (Art. VI, §10) provides:

> It shall be the duty of the Board to make an impartial investigation and study of applicants for commutations, pardons or parole, and by a majority vote make its recommendations to the Govern or all persons deemed worthy of clemency.

72.     The Oklahoma Constitution (Art. II, §34) provides:

> A victim of crime shall have the following rights, which shall be protected by law in a manner no less vigorous that the rights afforded to the accused; to be treated with fairness and respect for the victim's safety, dignity and privacy;…to be given reasonable and timely notice and to be present at all…proceedings; and…to be heard in any proceeding involving release…parole and any proceedings during which a right of the victim is implicated.

73.     The Pardon and Parole Board has no authority to change the range of punishment for a crime *after* it is committed, pursuant to the Oklahoma Constitution (Art.

V, §54), which provides:

> The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute.

74.     The Oklahoma Constitution (Art. VI, Section 10) provides the Pardon and Parole Board "shall have the power and authority to grant parole for nonviolent offenses after conviction…(it) may deem proper or as may be required by law." Likewise, it has "no authority to grant, but may recommend parole for person sentenced pursuant to Section 13.1 of Title 21 of the Oklahoma Statutes…."

75.     The Oklahoma Pardon and Parole Board's Mission Statement provides that it "serves the citizens of Oklahoma by making careful and informed decisions, focusing on public safety, offender accountability and re-entry, and victim rights."

76.     Oklahoma law (57 O.S. 332) provides the Governor has the power to grant "commutations, paroles and pardons for all offenses…subject, however, to the regulations prescribed by law and the provisions of Section 10 of Article VI of the Oklahoma Constitution."

77.     On its website, the Board describes a commutation as "a change of sentence to one that is less severe…. Commutation is not intended to serve as an early release mechanism for an offender in prison. A commutation is intended to correct an unjust or excessive sentence.  A commutation is a rare, separate and distinct process from a pardon or parole…" The Board further states that the process utilizes a two-stage process for commutation review: 1) a Qualification Review in which the board will conduct a jacket review to determine if the Application has merit and should be passed to Stage Two, a commutation hearing for further investigation and consideration for a sentence

commutation, in which the offender will have a personal appearance with the Board, and in which representatives of both the offender and victim, plus the District Attorney would be allowed to protest. After the personal appearance, the Board will vote on whether to recommend a commutation and, if passed, forward the recommendation to the Governor. (A copy of the website explaining the process is attached hereto as "Exhibit-7")

78.     From November 2, 2021, through May 12, 2022, the Oklahoma County Grand Jury met on numerous occasions to investigate several topics, including the events that led to Defendant Anderson being considered—and granted—commutation in this case.

79.     The Oklahoma County Grand Jury, in its report filed publicly on May 12, 2022, found as follows:

a.     That for a period beginning in 2019 and up until mid-2021, the procedures for checking information on each commutation request were ignored and an inmate was placed onto a commutation docket simply by asking for a commutation;

b.     The overall push at the Board was "volume" over anything else, that "corners were cut" and "processes were ignored" in order to get the highest number of people onto the commutation dockets;

c.     The process was described as "quantity over quality" and designed to "get more people out of prison";

d.     Several members of the administrative staff voiced concerns that checks were not being done, but these concerns were ignored;

e.     Defendant Anderson re-applied for commutation on August 8, 2019.

f.     Pursuant to Board Rules and Protocols, Defendant Anderson was not eligible for consideration until three years after his January 17, 2019, application had been denied; nevertheless, he was granted the opportunity for a hearing on his application.

g.     An Investigative Report was done and clearly told the Board that Defendant Anderson was a high risk to re-offend.

h.     Despite being unlawfully re-docketed within the three-year period, which was clear from a cursory reading of the second application,

Anderson was recommended for commutation.

i.   After his commutation, "Anderson is alleged to have killed three people, cutting the heart out of one victim, as well as allegedly killing a small child."

j.   It appeared the three deaths could have been avoided had the Board rules and applicable law been followed.

k.   If the checks and safeguards that had been put in place prior to 2019 had been followed, the application for commutation likely would not have been placed onto the docket for consideration a second time.

l.   There was nothing in the public record or testimony that described some change in Anderson's circumstances over those seven months that would account for the change from an unfavorable to a favorable recommendation.

m.   At least one high level member of the Board's administrative staff became aware of the Anderson case being docketed in error, which could have been easily corrected; however, a unilateral decision was made by one person to not bring it to the attention of the Board or the Governor's office.

n.   The Commutation process was in fact used as an "early release mechanism" and was anything but "rare."

o.   At the time the Board considered Defendant Anderson's commutation, there was a rush to get more and more people out of prison.

p.   After determining a mistake had been made, no one connected with Board conducted any sort of investigation at any time to determine what happened in regard to Mr. Anderson's case. Neither the Defendant Governor, Board nor DOC has disciplined anyone as a result of the conduct that led to Defendant Anderson being released.

80.   A review of the above clearly shows that members of the Board displayed a complete and deliberate indifference in performing their duties. The failure to do a follow up investigation as to why it happened, which resulted in such dire consequences, is further proof of the deliberate indifference of the Board in this matter.

81.   As it relates to the consideration of Defendant Anderson's release from

confinement and commutation, the State's established protocols were not followed.

82.     As a result of the State not following its established protocols, Defendant Anderson was improperly released from confinement with DOC.

83.     The Board knew that Defendant Anderson posed a threat to the safety of both himself and others at the time he was considered for commutation.

84.     The Board knew at all times pertinent to this action that Defendant Anderson had applied for commutation in 2019, but that it had denied his Application.

85.     The Board knew at all times pertinent to this action that its protocols, policies and procedures provided that if someone had applied for commutation of sentence but was denied, that person could not re-apply for a period of three years from the date of denial.

86.     If Defendant Anderson had not been improperly released by the Pardon and Parole Board, and the State of Oklahoma through the Governor, Defendant Anderson could not have killed Andrea Blankenship, Leon Pye and of K.W.R.P. and could not have injured Delsie Mae Pye.

87.     Before Defendant Anderson's commutation was approved and he was released, at least one individual from, or related to, the Board knew that an error had been made in submitting Defendant Anderson's Application to the Board and/or Governor.

88.     The Board knew that Defendant Anderson posed a threat to himself and other people in the community, including but not limited to causing serious injury or death to himself or others.

89.     Before Defendant Anderson was released, someone from or affiliated with the Board knew that the three-year requirement was being violated, but -with deliberate indifference—did nothing to stop the proceedings or deny the application on the basis that

Anderson was not eligible.

90.     The Board and the State did not have the discretion to do nothing, and doing nothing was not an act embraced within the discretion granted to agent, servants and employees of the Board or the State.  Established protocols required the Board and the State to act in specific ways in response to the information it had, specifically to stop the process and deny the application.

91.     The Board and the State violated established protocols, which governed its conduct in processing applications for commutation and allowing them to be presented to the Board.

92.     Despite the Board and the State knowing of Defendant Anderson's violent behavior and finding that he posed a threat to himself and others, the Board failed to follow established protocols that would have prevented the deadly acts by Defendant Anderson from occurring.

93.     After Defendant Anderson was released, the State knew he violated the terms of his release to the extent he did not follow up with Red Rock, honor his obligations by taking his medications; however, the State made no effort to detain or arrest him for violating the terms of his probation that the State knew could reasonably foreseeably result in him committing violent acts against himself or others.

94.     The Board and the State owed a legal duty to the people of the State of Oklahoma –and those anywhere near a released Defendant Anderson— to comply with its mandatory procedures governing the right to be considered for commutation.

95.     Submitting Defendant Anderson's application for commutation of sentence was a violation of the rules, protocols, policies and procedures as noted above.

96.     The Board and Governor are charged with operation and supervision of the process in which applications for pardons, paroles and commutation of sentences are processed, and have a duty to Plaintiffs to ensure it is done correctly.

97.     The Board and Governor knew the rules, protocols, policies and procedures prohibited Defendant Anderson from being considered for commutation within three years of his previous denial, but they responded inappropriately and with deliberate indifference resulting in the release of a dangerous inmate.

98.     John or Jane Doe and/or others described as a high level member of Administrative Staff of the Pardon and Parole Board noticed that Defendant Anderson's application for commutation of sentence was illegally and improperly submitted, but one or more administrators of the Board made the conscious and deliberate decision to violate the policies, procedures, rules and protocols and both proceed with processing the application and not tell anyone the application should not have been presented for approval.

99.     Upon release from his incarceration, Defendant Anderson was required to report to Red Rock Mental Health facility.

100.    Defendant Red Rock was required to counsel, treat and monitor Defendant Anderson after his release from incarceration, including but not limited to ensuring he received and was taking his medications.

101.    Defendant Red Rock knew Defendant Anderson had a history of mental health issues before he was released from incarceration and as it (Red Rock) began to treat him as a patient.

102.    Defendant Red Rock knew at the time it was treating Defendant Anderson that he posed a threat to himself and others.

103.     Although Defendant Anderson had a history of mental illness and Defendant Red Rock knew of the medications he needed, Defendant Red Rock failed to administer the medications to Defendant Anderson.

104.     Defendant Red Rock failed to provide Defendant Anderson with appropriate psychiatric care.

105.     Defendant Red Rock was negligent in permitting Defendant Anderson to go days without receiving necessary psychiatric medication and treatment.

### III.     FIRST CAUSE OF ACTION--NEGLIGENCE

106.     Plaintiff adopts and incorporates by reference herein paragraphs 1-98 as though fully set forth herein.

107.     The protocols, rules, policies and procedures of the State, the Board and DOC from 2019-2021 provided that an inmate whose application for commutation of a sentence was denied could not be submitted for consideration for a period of three years after the denial, as discussed above.

108.     Members of the Board owe a duty to individual members of the general public when the Board decides to release a prisoner with a history of violent and dangerous conduct toward his or her fellow human beings; the standard of care owed is that of avoiding grossly negligent or reckless release of a highly dangerous prisoner. (See, for example, *Grimm v. Arizona Board of Pardon and Parole,* 564 P.2d 1227 (Ariz. 1977).

109.     Defendants State, Governor, Board and DOC breached their duties under the protocols, rules, policies, and procedures and were thus negligent in allowing Defendant Anderson's application for commutation to be considered and approved less than one year from the date his prior application was denied.

110. Defendant DOC had a duty to supervise Defendant Anderson but was grossly negligent in failing to properly supervise Defendant Anderson, which caused and contributed to Defendant Anderson's actions as listed above.

111. The Board had a duty under state law to the public, and to Plaintiffs, to enforce and uphold internal rules, policies and procedures and state law governing the submission, processing and approval of commutation applications.

112. The Board did not properly advise the Governor that the application was improper because Anderson had previously been denied relief and the second commutation application was submitted less than three years from Defendant Anderson's last application denial.

113. The Governor was negligent in failing to ascertain whether Defendant Anderson was eligible for commutation, in failing to review Defendant Anderson's criminal record, the Department of Correction opinions that Defendant Anderson was a danger to himself and others, and in failing to protect Plaintiffs' 14th Amendment rights of life, liberty and equal protection under the law.

114. The Board was negligent in failing to follow and enforce its own internal rules, policies and procedures and state law governing the application, processing and approval of applications for commutation of a sentence and failed to protect Plaintiffs' 14th Amendment rights of life, liberty and equal protection under the law.

115. The Board was negligent in allowing the application of Defendant Anderson to be considered by the Pardon and Parole Board in light of the fact that a) his prior application had been denied less than one year from the date the application at issue was submitted; b) the Board knew that the application was not timely filed and should not be

allowed to proceed under the rules, protocols, policies and procedures of the Board, but allowed it to proceed and be granted nonetheless; and c) the Board knew at the time the application was pending that Defendant posed a danger to himself and others.

116. In performing its job to screen those eligible for commutation of sentences such as Defendant Anderson, the Board has the duty to ensure it is following its own policies and procedures.

117. In performing its job to screen those eligible for commutation of sentence such as Defendant Anderson, the Board knew that many inmates such as Defendant Anderson suffer from mental illness and pose a threat to themselves and members of the public. All Defendants knew that releasing someone like Defendant Anderson into a private residence in a neighborhood setting would put all nearby residents and neighbors at a high risk of being harmed.

118. In performing its job to screen those eligible for commutation of sentence such as Defendant Anderson, the Board has a duty to protect members of the public from people like Defendant Anderson whose applications are denied and whose condition is determined be a threat to themselves or others in the public by obeying the rules, regulations, protocols and policies and procedures and not letting those denied be considered for commutation of sentence for a period of three years.

119. At the time Defendant Anderson's application for commutation of sentence was submitted in 2020, Defendant Governor, DOC and the Board knew Anderson had psychological problems, needed care and treatment and posed a threat to himself and others.

120. As a result of the breach of duty and negligence by the State, Governor,

Board and DOC in violating their rules, protocols, policies and procedures, Defendant Anderson's application for commutation of sentence was approved by the Board and, ultimately, by the Governor, resulting in Defendant Anderson being released from prison prematurely and contrary to the rules, protocols, policies and procedures that were supposed to control his situation.

121.   As a result of the breach of duty and negligence by the State, Governor, Board and DOC in violating their rules, protocols, policies and procedures, Defendant Anderson's application for commutation of sentence was submitted to and approved by the Board and, ultimately, the Governor, resulting in Defendant Anderson being released from prison prematurely and able to savagely and viciously kill Andrea Blankenship, Leon Pye and K.W.R.P. and severely injure Delsie Mae Pye.

122.   Defendants DOC and the Board failed to provide Defendant Anderson with appropriate psychiatric care while under their custody and control, and ensure that he had improved and no longer posed a threat to himself or others before releasing Anderson.

123.   Defendants DOC and the Board had a non-delegable duty to conduct pre-release transition planning to ensure Defendant Anderson would receive continuing medication and a transfer of responsibility to a community-based service provider.

### A.   RED ROCK

124.   Defendant Redrock knew at the time it began treating Defendant Anderson that he had severe psychiatric issues and posed a threat to both himself and others.

125.   Defendant Red Rock had a duty, pursuant to its contract with the State and applicable law, to provide adequate and/or proper medical care and to warn anyone it knew or should have known would be endangered based on Defendant's Anderson's records, and

encounters it had with him, at which time seeking an Involuntary Order of Detention would have been appropriate.

126.   Defendant Red Rock knew that Defendant Anderson suffered from mental health issues that, if not controlled through treatment, could foreseeably lead to him being violent against other people, including injuring or killing them.

127.   Defendant Red Rock knew that someone such as Defendant Anderson not taking his medication as prescribed and directed could foreseeably lead to him being violent against other people and the public, including but not limited to injuring or killing them.

128.   Defendant Red Rock knew that someone such as Defendant Anderson not taking his medication as prescribed and directed substantially put him at risk of being violent against other people and the public, including but not limited to injuring or killing them.

129.   Defendant Red Rock was aware Defendant Anderson was experiencing mental health problems and knew a substantial risk of serious harm existed, including but not limited to the fact that Defendant Anderson could cause serious harm or death to others.

130.   Defendant Red Rock was negligent in that it had a duty to provide proper treatment, monitoring and supervision of Defendant Anderson, but breached that duty when it failed to:

    a.    Provide proper treatment for Defendant Anderson once he was out of prison;

    b.    Provide proper supervision of Defendant Anderson once he was out of prison;

    c.    Provide Defendant Anderson with the proper medication he needed to refrain from barbaric behavior and not pose a threat to himself and/or

others; and

d.   Monitor and ensure that Defendant Anderson was taking his medications.

131.   Defendant Anderson did not receive reasonable mental health care.

132.   Defendant Anderson did not receive reasonable medical care.

133.   Defendant Red Rock was retained for purposes of providing medical care and/or mental health care to Defendant Anderson.

134.   The above acts or omissions by Defendant Red Rock deprived Defendant Anderson of the minimal care that he required.

135.   Defendant Red Rock knows that persons such as Defendant Anderson, who had been diagnosed as a danger to himself or others, pose a direct threat to the public when released into society without receiving proper treatment and medications.

136.   Defendant Red Rock failed to supervise Defendant Anderson and ensure or confirm he was taking the medications he needed to control his behavior, which was reckless conduct on its behalf.

137.   The negligence of Defendant Red Rock caused or contributed to Defendant Anderson's action in killing Andrea Blankenship, Leon Pye and K.W.R.P. and injuring Delsie Mae Pye.

## B.  ALLEGATIONS AGAINST BOARD, DOC AND GOVERNOR

138.   Plaintiffs adopt and incorporate by reference herein all material allegations contained in paragraphs 1-138 as though fully set forth herein.

139.   Defendants Board and Governor both acted as a final policy maker for the Board and the State of Oklahoma and the operation and supervision of the Board, its employees and processing and approval of applications for commutation of sentences.

140.   Defendant Governor ran for office on a platform of reform and to make Oklahoma a "Top Ten State" in everything it does.

141.   Defendant Governor also campaigned on reducing the prison population, to alleviate prison overcrowding and to save taxpayers of the State of Oklahoma millions of dollars for caring and supporting inmates he believed should not be incarcerated.

142.   Defendant Governor appointed members to the State's Pardon and Parole Board as part of his duties as Governor of the State of Oklahoma.

143.   Before appointing people to the State's Pardon and Parole Board, Defendant Governor interviewed the prospective members and, during the course of the interview, let the potential prospective members know his views regarding the state's correctional system, problems with overcrowded prisons, his belief that the Pardon and Parole Board should be releasing more people than it had in the past, and his plan for paroles and commutations in the future.

144.   In 2019, the State Pardon and Parole Board's policy was to allocate 20 minutes per application for parole or commutation of sentence to give consideration and, supposedly, a purposeful review of each application.

145.   In October of 2019, the Board held a special meeting to consider over 800 Applications.

146.   On November 1, 2019, the Board announced it recommended 527 people serving low-level drug and nonviolent offenses would go free; the Governor later approved all of them to go free. The Washington Post reported that Oklahoma lawmakers and the Governor called it the largest single-day commutation in both state and U.S. history. The Board announced the mass commutations will save taxpayers an estimated $11.9 million

based on costs projected if the eligible prisoners served their full terms. On April 14, 2022, The Oklahoman reported that nearly half of the prisoners released had been rearrested. (Exhibit-5)

147.   In a Resolution proposed "in support and appreciation of Steven Bickley," who was the Executive Director of the Board at all times pertinent to this action, the proposed Resolution stated that under his leadership:  (a) the agency was able to double its docketed caseloads without increasing overall staff levels; (b) the staff instituted a system which reduced the number of investigative reports required to be prepared by the field staff and, in turn, to be reviewed by the Board, by 25 percent monthly; (c) from January through April of 2020, the Board docketed 280 percent more cases than for the same period in 2019, and heard more cases in that four months than it did the entire year of 2018; (d) the Board was awarded the Governor's Leadership Award for best overall agency performance for 2019; (e) in November of 2019, the Board recommended commutations and the Governor approved them, constituting the largest single day commutation in United States history; and (f) since the November 2019 special meeting, the agency held 1269 dockets resulting in the release of more low-level, non-violent offenders under the "efficient single-stage commutation docket approach" (Exhibit-8). The Associated Press reported that Mr. Bickley announced at the December 2019 board meeting that the Board had more than doubled its caseload from the year before.

148.   Due to former Executive Director Steven Bickley cutting corners, abandoning policies and procedures to such a degree that it may be left to chance that someone may "happen to discover" an undisputed fact that Defendant Anderson (or someone like him) was not eligible for commutation, and not say something to stop the

commutation, Mr. Bickley, the Board and others involved engaged in a pattern and practice of violating the policies, procedures and rules related to the commutation process, especially to the extent they created, developed and implemented a plan, policy, procedure, habit and/or custom that was contrary to state law or regulations, and knowingly put the public at risk and danger.

149.   In deciding not to tell the Board about the fact that Defendant Anderson was not eligible for consideration, Mr. Bickley, John or Jane Doe, the Board and others involved violated the policies, procedures and rules related to the commutation process, especially to the extent that the use of the "single stage" commutation process was governed by the creation of flawed training protocols, lack of supervision and tolerance of numerous constitutionally infirm activities of subordinates, to-wit:

> a.   Establishing a pattern and practice in which the constitutional rights of life, liberty and property of citizens were violated by deliberate disregard for those rights in allowing inmates who were ineligible for parole or commutation to be considered for commutation;
>
> b.    Establishing a pattern and practice in which the constitutional rights of life, liberty and property of citizens were violated by deliberate disregard for those rights in allowing inmates who were ineligible for commutation to be considered for commutation when it knew Defendant Anderson had been diagnosed as being a danger to himself and the public; and
>
> c.   Establishing a pattern and practice in which the constitutional rights of life, liberty and property of citizens were violated by deliberate disregard for those rights in allowing inmates who were ineligible for commutation to be considered for commutation when it knew Defendant Anderson had been diagnosed as being a danger to himself and the public, and that with deliberate indifference made the decision not to advise the Board of the fact that Defendant Anderson was not eligible for commutation.

## IV. SECOND CAUSE OF ACTION:

## VIOLATION OF CIVIL RIGHTS – 42 U.S.C. 1983

150.    Plaintiffs adopt and incorporate by reference herein all material allegations contained in paragraphs 1-150 as though fully set forth herein.

151.    Defendants deprived Plaintiffs of their rights and privileges of life and liberty afforded to them under the Fourteenth Amendment of the United States Constitution in violation of 42 U.S.C. 1983.  As described above, the actions of the Defendants were clearly intentional and constituted a violation of their own policies, customs and practices which caused the violation of Plaintiffs' Constitutional rights.

152.    "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." See *Grimm v. Arizona Board of Pardon and Parole,* 564 P.2d 1227 (Ariz. 1977).

153.    Defendants in their quest to accomplish the largest mass commutation in United States history adopted a policy in processing applicants such as Defendant Anderson in a manner inconsistent with its long established protocols, and engaged in practices that became widespread within the Board and Office of the Governor. Either, or both, the executive director of the Board and the Governor were officials with final policy-making authority as it related to the actions and conduct of the Board and the process designed to accomplish the largest commutation in United States history.

154.    The question of whether Defendant Anderson's application for commutation can be presented to the Board based on the fact that a) his prior application had been denied approximately three (3) weeks before the application at issue was submitted to the Board, b) the state statute prohibited and Board has a rule that an application for commutation of sentence cannot be submitted for three years after an inmate's application for the same has

been denied, and c) the decision to put Defendant Anderson's application before the Board for consideration, was not a "discretionary" decision for the reason that the timing requirement was objective and mandatory, not a subjective or discretionary decision.

155.   The Board's actions in submitting and approving the Application was a violation of the mandatory three-year rule that released a known violent inmate into the public who killed the three Plaintiffs' decedents and injured a fourth Plaintiff; thus, the actions as described in the paragraphs above constituted a state-created danger.  But for the State-created danger, Anderson could not have killed or injured.

156.   The Board, its officers and administrators knew Defendant Anderson should not be considered for a commutation of sentence as a matter of law; however, they nevertheless submitted the same to the Board for its approval without telling Board members Anderson was statutorily (or through the Board's policies and procedures, rules and regulations) ineligible for consideration.

157.   The 2019 denial of Defendant Anderson's first application for commutation of sentence should have blocked any further commutation consideration for three years from the date of the denial.

158.   Under the state-created danger doctrine, a state actor can be held liable for failing to protect a person's interest in his personal security or bodily integrity when the state actor affirmatively and with deliberate indifference places that person in danger. (See *Pauluk v. Savage,* 836 F.3d 1117, 1112 (9th Cir.2016)).

159.   In allowing Defendant Anderson's second application to proceed through the commutation process and be approved, the State allowed a known-violent felon, who posed a threat to himself and others and was not eligible for commutation, out into the public and

in a neighborhood, putting Plaintiffs in a worse position than that in which they would have been had the State (the Board) not acted at all, i.e., if the Board had followed its rules and regulations and done nothing with Defendant Anderson's application, he would not have been released into the public and would not have killed and injured Plaintiffs herein.

160.    The actions of Defendants in knowingly putting Defendant Anderson's application for commutation before the Board, even though it knew he was not eligible for consideration and in deciding not to advise Board members of their previous denial and that he was not eligible for consideration, was an affirmative act that exposed Plaintiffs to actual, foreseeable, particularized dangers.

161.    In reviewing case law involving the Eighth Amendment of the United States Constitution, the United States Supreme Court held, and set a standard, that a Plaintiff must show that Defendants had a culpable state of mind known as "deliberate indifference," which exists when an official "knows of and disregards an excessive risk to inmate health and safety." In such cases, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." See *Farmer v. Brennan,* 511 U.S. 825 (at 834, 836-37, 842), 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In addition, a claim for deliberate indifference can be drawn when county commissioners fail to provide financing for correction of deficiencies "likely to lead to assaults against inmates." *Lopez v. LeMaster,* 172 F.3d 756 (10th Cir. 1999).

162.    While the standard listed above was in connection with the Eighth Amendment, Plaintiffs' (and the public's) Constitutional rights under the 14th Amendment are no less important and no less protected than any other Constitutional rights.

163.    Defendant Board, through its administrator, officers, agents, servants and

employees, knew that at the time of his commutation that Defendant Anderson remained "a threat to both society and himself."

164. Defendants knew of "and disregarded an excessive risk to" the health and safety of Plaintiffs and the public; Defendants Governor and Board "acted or failed to act despite (their) knowledge of a substantial risk of serious harm."

165. Given Defendant Anderson's known violent behavior, DOC evaluation that he would pose a danger to himself or others, and his previous Application for Commutation having been denied, Defendants Governor and the Board knew it was likely Defendant Anderson would commit a violent act if released in 2019 or 2020 and Plaintiffs faced a substantial risk of serious harm.

166. Defendants Board and Governor knew Defendant Anderson posed a substantial risk of serious harm to others but disregarded that risk by failing to take reasonable steps such as following its own rules, policies and procedures.

167. Defendants Governor and Board, through its administrator, officers, agents, servants and employees, also knew that at the time of Defendant Anderson's second commutation application that in 2017 Grady County prosecutors recommended Defendant Anderson serve his entire sentence.

168. Defendants objectively knew of the risk to Plaintiffs by not following their own procedures and by releasing Defendant Anderson.

169. Defendants subjectively knew of the risk to Plaintiffs by not following their own procedures and by releasing Defendant Anderson.

170. As part of the commutation process, the District Attorneys of the County in which the inmate was convicted are supposed to receive notice of the commutation

proceedings and have the opportunity to object; however, the District Attorney's office which prosecuted Defendant Anderson (Grady County, State of Oklahoma) did <u>not</u> receive notice that Defendant Anderson was being considered.

171.    Defendants had an affirmative duty to protect the public from present and continuing harm and to ensure that persons who were not eligible for commutation of sentencing and posed a danger to the public were not released into the public.

172.    Defendants had an obligation to the citizens of the State of Oklahoma to maintain a commutation process that prevented persons ineligible from consideration and who posed a danger to themselves and others (the public) from being considered for commutation and release into the public.

173.    Defendants had an obligation to the citizens of the State of Oklahoma to maintain a commutation process that prevented persons ineligible from consideration and who posed a danger to themselves and others (the public) from being considered for commutation and release into the public, and to affirmatively advise members of the voting Board of the deficiencies of the application and to not affirmatively refrain from advising the Board about the ineligibility and danger that the applicant presented to himself and the public.

174.    The failure of Defendants to adequately attend to their jobs as required caused or contributed to the deaths and injury of Plaintiffs.

175.    The conduct of Defendants evinced a deliberate indifference to the safety of Plaintiffs and the public.

176.    Defendants violated their own policies and procedures in allowing Defendant Anderson to be released into the public.

177.   Through the mass commutation program designed to release thousands of inmates, Defendant State engaged in a pattern and practice that it knew would result in harm to members of the public, such as releasing Defendant Anderson in light of the reports he was a danger to himself and others.

178.   Given its knowledge that Defendant Anderson posed a threat to himself and others, Defendants knew and recognized the release of Defendant Anderson was an unreasonable risk, and through its decisions to knowingly violate the policies and procedures related to the commutation process, clearly intended to expose Plaintiffs and the public to such risks without regard to the consequences to Plaintiffs and the public, i.e., Defendants Board and Governor knew that something bad was probably going to happen, but ignored the risk and exposed Plaintiffs to the same.

179.   The actions of Defendants in deliberately not informing Board members who voted on commutation that Defendant Anderson a) was not eligible for consideration and b) posed a danger to himself and others (the public) evidenced a deliberate indifference to the needs of the public.

180.   The actions of Defendants in deliberately suppressing information and making the conscious decision not to advise Board members who voted on the commutation of Defendant Anderson evidenced a deliberate indifference to the needs of the public.

181.   Defendants exhibited a reckless disregard for the safety and welfare of the public when they continued to allow persons such as Defendant Anderson to be considered and released, when they knew he was not eligible for consideration and posed a danger to himself and the public.

182.    Under the 14th Amendment, Plaintiffs had a clearly established due process right to life and liberty; Defendants deprived Plaintiffs of those rights by adopting policies and/or practices that substantially increased the risk of harm to an identifiable population by permitting Defendant Anderson to be released contrary to the rules, policies and procedures that were in place to prohibit people like Defendant Anderson from even being considered for commutation.

183.    The acts or omissions of the Defendants violated the Fourteenth Amendment rights of Plaintiffs; accordingly, Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983.

184.    The actions of the individual Defendants, through their own individual actions, violated Plaintiffs' Constitutional rights as outlined above, making them personally liable to Plaintiffs for the reasons that each individual Defendant a) knew of the danger or threat of harm that Defendant Anderson posed to Plaintiffs; b) knew that Anderson did not qualify for a parole, commutation or release; c) knew of his violent past and DOC's opinion that he posed a threat of harm to himself or others; d) knew that he had been disciplined for violence while incarcerated; and e) knew that he posed a threat of danger and harm to Plaintiffs if released.

185.    The drive or push to set a record for a mass commutation and make Oklahoma a leader in regard to the same led the Board and Defendants to create a policy that allowed and/or caused the dangerous conditions to exist.

186.    Ministerial acts are unshielded by qualified immunity, which protects only actions taken pursuant to discretionary functions. Any claim of immunity must distinguish between ministerial acts and discretionary functions. Non-compliance with a ministerial

duty bars qualified immunity.

187.     Through Defendants' willful and deliberate decisions to not follow the State Constitution, State laws and their own policies, the State created a danger that would not have otherwise existed.

188.     A State-Created danger doctrine exists where:

(a)     Defendants' affirmative actions, enhanced and/or created the specific danger.

(b)     Plaintiffs suffered Injuries which were foreseeable; and

(c)     Defendants exhibited "Deliberate indifference" to the likelihood that their actions could cause.

## V.     THIRD CAUSE OF ACTION—DEFENDANT ANDERSON

190.     Plaintiffs adopt and incorporate by reference herein all material allegations contained in paragraphs 1-189 as though fully set forth herein.

191.     Defendant Anderson intentionally killed Andrea Lynn Blankenship, Leon Pye, K.W.R.P. and intentionally injured Delsie Mae Pye.

192.     Delsie Mae Pye has suffered and will continue to suffer permanent injuries, loss of sight in one eye, and drastically diminished sight in the other.

193.     The estates of all three of the deceased listed above are each entitled to recover actual damages under the wrongful death statutes of the State of Oklahoma against Defendant Anderson.

194.     Plaintiff Delsie Mae Pye is entitled to recovery bodily injury damages from Anderson.

## VI.     FOURTH CAUSE OF ACTION --PUNITIVE DAMAGES
## (JOHN or JANE DOE, RED ROCK and ANDERSON)

195.     Plaintiffs adopt and incorporate by reference herein all material allegations

contained in paragraphs 1-194 as though fully set forth herein.

196.   As detailed above, the actions of Defendant Red Rock and Defendant Anderson were reckless at a minimum, and Plaintiff is entitled to punitive damages against Defendant Red Rock for reckless conduct and Defendant Anderson for both reckless and intentional conduct as a matter of law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs now pray that judgment be rendered on their behalf and against all Defendants, in both their official and individual capacities, in an amount in excess of $75,000 as and for actual damages; in an amount in excess of $75,000 as and for punitive damages for the individual Defendants in their individual capacities; all costs incurred in connection with the prosecution of this action; a reasonable attorneys' fee; and all other relief this Court deems just and proper.

JURY TRIAL DEMANDED

Respectively Submitted by:

*s/ Tim D. Cain*
_____

Tim D. Cain, OBA #11779
WILSON CAIN & ACQUAVIVA
300 NW 13th Street, Suite 100
Oklahoma City, OK 73103-3709
(email) TimCain@swbell.net
(405) 236-2600, (Fax) 236-2607

*Attorneys for the Estate of*
*Andrea Lynn Blankenship*

*s/ Robert J. Wagner*
_____

Robert J. Wagner, OBA #16902
Jon J. Gores, OBA #31068
WAGNER & GORES
4401 N. Classen Blvd., Ste. 100
Oklahoma City, OK 73118-5038
(email) RJW@wagnerfirm.com
(405) 521-9499, (Fax) 521-8994

*and*

*s/ Kenyatta R. Bethea*
_____

Daniel L. Holloway, OBA #10341
Kenyatta R. Bethea, OBA #18650
HOLLOWAY, BETHEA & OTHERS
3035 NW 63rd Street, Suite 102N
Oklahoma City, OK  73116-3632
(email) KBethea@hbolaw.com
(405) 246-0600, (Fax) 810-4080

*Attorneys for Delsie Mae Pye and the*
*Estates of Leon W. Pye,*
*and K.W.R.P..*